# IN THE COURT OF APPEALS OF IOWA

No. 20-1160
Filed April 14, 2021

**ADAM DUANE HAUGEN,**
Plaintiff-Appellee,

**vs.**

**NIKI GREENWOOD,**
Defendant-Appellant.
_____

Appeal from the Iowa District Court for Clinton County, Tamra Roberts,

Judge.

The mother appeals the district court's award of joint physical care.

**AFFIRMED AS MODIFIED AND REMANDED.**

Chase Cartee of Cartee Law Firm, P.C., Davenport, for appellant.

Joshua J. Reicks and Trista M. Beise of Schoenthaler, Bartelt, Kahler &

Reicks, Maquoketa, for appellee.

Considered by May, P.J., and Greer and Schumacher, JJ.

**GREER, Judge.**

After awarding joint physical care of an unmarried couple's three-year-old child, the mother, Niki Greenwood, appeals.[1] First, Niki claims the district court erred in awarding joint physical care and argues she should be primary caretaker of the child. In support of this claim, Niki challenges testimony from a witness, D.B., arguing the court erred in finding her testimony credible.[2] Second, Niki claims joint physical care is not in the best interest of the child because it would lead to time apart from the child's half-sister. Lastly, Niki requests we order the father, Adam Haugen, to pay her appellate attorney fees. Adam disputes Niki's claim that joint physical care is not in the child's best interests. He maintains D.B.'s testimony was credible. He also counters Niki's request for appellate attorney fees with his own request for appellate attorney fees.

---

[1] The district court ordered the following physical care schedule:
> [T]he Court finds that the 3-3-2 rotation should be utilized; one parent of the child for three days, then the other parent of the child for three days, then the first parent for two days. The rotation will then start over with the second parent starting the rotation. This will give each parent weeknights and weekends with the child.

[2] D.B.'s testimony at trial was particularly important considering the district court said:
> Each party presented several witnesses. They were character witnesses, and each could provide little insight into each person's parenting. Some witnesses had only seen the parents both interact with the child three to four times a year or less. The witness that provided some of the best insight was [D.B.]. [D.B.] was previously a friend of Niki and had later supervised the visits between the child and the father when supervision was required. Her testimony was not biased, and comparable to what you would see from a guardian ad litem for a child. She was a voice for the child. She was credible.

**I. Facts and Earlier Proceedings.**

We begin by summarizing the parent's relationship history and the events leading to this appeal. Niki and Adam began dating in late 2015 and moved in together in 2016. Nikki gave birth to their daughter, K.L.G.H., in September 2017. Niki and Adam got engaged in spring of 2017, but the engagement was later called off. Ultimately, Niki and Adam separated in June 2019 due to relationship issues, and Adam moved out of the family home and in with his parents. Adam did not see the child for two months after the separation, and the parties dispute whether Niki prevented contact or if Adam lacked initiative to seek contact. Later on, per an out-of-court agreement, Adam began supervised visits with the child. Niki selected a friend, D.B., to supervise visits between the father and child in D.B.'s home. Only three of these visits occurred under this plan.

Then in July 2019, Adam petitioned the court to establish paternity, custody, visitation, and support.[3] Simultaneously he applied for temporary custody and support. In his combined filing, Adam requested joint legal custody and physical care of the child with scheduled visitation for Niki. Niki answered with her own request for physical care of the child and a request for attorney fees.[4] A temporary hearing took place in September 2019. The court awarded the parents joint legal custody of the child with temporary physical care in Niki. The order granted Adam unsupervised overnight visits every other weekend, but required Adam to refrain from the use of alcohol and secure all firearms while the child was with him.

---

[3] He later amended his petition on August 12, 2019.
[4] Niki asked the court to order Adam "to pay temporary and permanent attorney fees and costs to . . . Niki . . . to defend this action." The district court never addressed her request in its ruling.

Trial began in July 2020 to determine the permanent care arrangement for the child. Although Adam requested physical care of the child in his pleadings, at trial he also supported a joint physical care arrangement. While approving the joint custody status, Niki maintained she should be the physical caretaker of the child. After a two-day trial involving testimony from fourteen witnesses, including the parties, the district court awarded Adam and Niki joint physical care of the child.

**Parents' Background.** Niki is thirty-five years old. Besides her child with Adam, Niki has an older daughter from a prior relationship. She has an associate's degree and is a licensed real estate agent in Iowa and Illinois. Niki is employed by Keller Williams Realty. The district court computed her annual income at $42,842. She describes her schedule as very flexible and works mostly from home but attends real estate showings or closings once or twice weekly. Due in part to her flexible work schedule, Niki has been the primary caregiver of the child since birth.

Adam is thirty-two years old. His only child is his daughter with Niki. Adam works at ADM Construction in Clinton, Iowa as a supervisor and has remained employed with ADM Construction for almost fourteen years. He works forty hours a week on average, 6:00 a.m. to 4:30 p.m., Monday through Thursday.[5] Adam works occasional overtime, but less so since the outbreak of the COVID-19 pandemic. Adam's annual income is $88,000.

**Relationship Issues and Parenting Concerns.** Nikki and Adam began experiencing relationship issues during the summer of 2017. Their primary

---

[5] Some evidence suggested Adam worked most Fridays, leaving home at 5:20 a.m. and returning home from work at 3:00 p.m. His earnings from years before the pandemic exceeded $100,000. Adam earns $36.43 per hour.

disagreements centered on Niki's disapproval of Adam's drinking habits, his anger, and his lack of involvement with the family. Concerning the drinking, Adam admitted he had a drinking problem in his early twenties, resulting in two convictions for operating while intoxicated by age twenty-three, but he maintained he no longer has a drinking problem. Addressing her assertions, Adam claims Niki did not want him to drink any alcohol and that she exaggerates his drinking. He testified he would have a couple of drinks at times after work but has no dependency on alcohol. Several witnesses gave testimony about Adam's drinking habits. The paternal grandmother testified that Adam would have a beer or two after work twice a week and described his drinking as responsible. She also confirmed Adam's testimony that he had not drank in two and a half months at the time of trial. A mutual friend of Adam and Niki testified he had "occasionally" seen Adam abuse alcohol but never saw him drink in the presence of the child. Other witnesses testified they believed Adam had a drinking problem, but this was based mostly on conversations with Niki rather than firsthand knowledge. But one witness observed Adam drinking whiskey at Niki's baby shower and another heard him tell a story of how he drank so much on a fishing trip he did not know where he was. Adam downplayed the reports he made to his doctor about drinking and the doctor's note of alcohol abuse.

Niki also points to Adam's anger and abusive behavior as contributing to the decline of their relationship. She said Adam struggled with anger and depression after the birth of their child, and she described angry outbursts where Adam would throw items and kick things, including the family dog. Niki said some of these incidents took place in front of their child, and she believed it

terrified the child. There was a confirmed incident shortly after the child's birth where Adam threw a box of DVDs and speakers down the basement stairs, and another where he threw a box of dishes.[6] Adam acknowledges he experienced anger and mental-health issues during the relationship, and he confirmed threatening Niki with physical harm in the past. He denies ever threatening his child or Niki's older child. Adam also confirmed threatening his own life during arguments with Niki. The parties did attend relationship counseling, and Adam participated in individual therapy.

Communication issues were also a persistent theme in the relationship from the summer of 2017 onward. For instance, Niki claimed Adam left the home for days or weeks at a time without warning and would not communicate with her during his absences. A daycare provider and friend of the family confirmed Adam was not home often late in the relationship. Niki also described tension with Adam's family. She claimed Adam did not invite her to his family functions, including two Thanksgiving gatherings he attended while leaving her home with the child. Adam agrees that his relationship with his parents caused problems in his and Niki's relationship. When asked to elaborate, Adam said, "I don't think Niki liked how close my mom and I were. My mom was helping out with a lot of my finances when I was younger, and [Niki] didn't agree with that once her and I moved into the household together. So I think that was some tension."

Despite their issues, the parent's relationship improved somewhat in early 2019. At this point they mutually decided to work on their relationship and began

---

[6] Niki claims Adam threw the boxes at her both times; he admits to both incidents but maintains he did not throw anything in Niki's direction.

attending couple's counseling. Adam sought professional help for emotional issues and began taking medication for treatment. Still, the relationship ended when Adam moved out of the family residence and in with his parents in June 2019. At the time of trial, Niki resided in the family home and Adam continued his residence in his parents' home.[7]

After the parents separated, Adam did not see the child for two months, although this was partially attributable to Niki. Niki admits she did not ask Adam to care for their daughter during her showings and closings following the separation. She did not want Adam to see the child at the time because of his behaviors. To help with their communication, Niki gave Adam pamphlets about co-parenting education, but as to his participation, Adam noted during cross-examination

> Q. All right. So would it be fair to say that Niki, after your separation, wanted to try and improve the level of communication between the two of you? A. Yeah.
> Q. She gave you resources to help improve those communications? A. Yep.
> Q. And you chose not to look into it, correct? A. Sure.

---

[7] During the trial, there was a passing reference to a partition action filed by Adam involving the family home and real estate. In the ruling, the district court commented that relocation of either party "will not be classified as a substantial change in circumstances for purposes of modification of this order. It was well within the contemplation of this Court that the parties may live an hour apart or so." While that question is not before us now, we note the district court's position is in direct conflict with our holdings in other cases. *See Thorpe v. Hostetler*, 949 N.W.2d 1, 6-7 (Iowa Ct. App. 2020) (holding hour-long drive between homes made shared-care arrangement unworkable and was not in the best interests of the child); *Teggatz v. Ellingson*, No. 19-1816, 2020 WL 2065944, at *2 (Iowa Ct. App. Apr. 29, 2020) (holding the one-hour distance between parties' homes was a "major obstacle" to a joint physical care plan); *In re Marriage of Scurr*, No. 11-1905, 2012 WL 2122306, at *1 (Iowa Ct. App. June 13, 2012) (declining to award joint physical care because a forty-five minute commute was not in the best interests of the child).

Another point of contention between the two parents was the presence of firearms around the family home. Niki did not approve of the many firearms Adam owns, which she said he often kept unsecured around the house.

Adam contends that Niki is controlling and works to deprive him of contact with their child. To support his position, he draws our attention to what he saw as her efforts to keep him off the birth certificate[8] and to change the child's last name without his knowledge or permission. Adam also argues Niki restricted his time with the child by initially requiring supervised visitation and not allowing him overnight visitation at his parents' home. Niki asserts she restricted visitation to protect the child due to her concerns with Adam's drinking, his mental health, and the access to loaded guns.

**II. Standard of Review and Error Preservation.**

Cases involving physical-care arrangements are tried in equity, thus our standard of review is de novo. *In re Marriage of Hansen*, 733 N.W.2d 683, 690 (Iowa 2007). In the context of dissolution cases where physical care is contested, "[p]rior cases have little precedential value, except to provide a framework for analysis, and we must base our decision on the particular facts and circumstances before us." *In re Marriage of Will*, 489 N.W.2d 394, 397 (Iowa 1992) (citing *In re Marriage of Weidner*, 338 N.W.2d 351, 356 (Iowa 1983)). "Although we give weight to the factual findings of the district court, we are not bound by them." *In re Marriage of Mauer*, 874 N.W.2d 103, 106 (Iowa 2016). "We will disturb the district court's ruling 'only when there has been a failure to do equity.'" *Thomas v. Stotts*,

---

[8] Each party blamed the other for the fact Adam's name does not appear on the child's birth certificate.

No. 20-0659, 2021 WL 210985 at *1 (Iowa Ct. App. Jan. 21, 2021) (quoting *In re Marriage of Okland*, 699 N.W.2d 260, 263 (Iowa 2005)).

Adam argues Niki did not address error preservation in her appellate brief in violation of Iowa Rule of Appellate Procedure 6.903(2)(g), which requires appellate briefs to include "[a] statement addressing how [each] issue was preserved for appellate review." Adam asks that we dismiss Niki's appeal for failure to comply with the appellate rules. Niki contends there are numerous citations to the record showing how each issue was preserved on the question of physical care. While her brief is not a model of clarity as to error preservation, we agree the central physical-care issue was raised and considered in the district court, thus we decline to dismiss Niki's appeal. *See In re Estate of DeTar*, 572 N.W.2d 178, 181 (Iowa Ct. App. 1997) (providing the failure to comply with the Iowa Rules of Appellate Procedure can lead to summary dismissal of an appeal, but the court may still determine an appeal "as a matter of grace" if we believe we can do so without assuming the role of an advocate).

Finally, the parties' dueling requests for appellate attorney fees is left in our discretion. *See Markey v. Carney*, 705 N.W.2d 13, 26 (Iowa 2005).

## III. Analysis.

## A. Joint Physical Care.

The sole question is whether the district court's award of joint physical care is appropriate. Both parties agree that joint legal custody is appropriate,[9] but Niki

---

[9] Joint legal custody means:
> [A]n award of legal custody of a minor child to both parents jointly under which both parents have legal custodial rights and responsibilities toward the child and under which neither parent has

contends she should have physical care of the child. Adam finds the court-ordered plan acceptable. Joint physical care means:

> [A]n award of physical care of a minor child to both joint legal custodial parents under which both parents have rights and responsibilities toward the child including but not limited to shared parenting time with the child, maintaining homes for the child, providing routine care for the child and under which neither parent has physical care rights superior to those of the other parent.

Iowa Code § 598.1(4) (2019). When awarding physical care, our overriding concern is the best interests of the child. *Weidner*, 338 N.W.2d at 356. Our determination is not based on "perceived fairness to the [*parents*], but primarily upon what is best for the *child.* The objective of a physical care determination is to place the child[ ] in the environment most likely to bring [her] to health, both physically and mentally, and to social maturity." *Hansen*, 733 N.W.2d. at 695 (citations omitted). Our analysis is guided by a non-exclusive list of factors enumerated in Iowa Code section 598.41(3).[10] Our supreme court's decision in

---

legal custodial rights superior to those of the other parent. Rights and responsibilities of joint legal custody include but are not limited to equal participation in decisions affecting the child's legal status, medical care, education, extracurricular activities, and religious instruction.

Iowa Code §598.1(3).

[10] Section 598.41(3) provides:

> In considering what custody arrangement . . . is in the best interest of the minor child, the court shall consider the following factors:
> a. Whether each parent would be a suitable custodian for the child.
> b. Whether the psychological and emotional needs and development of the child will suffer due to lack of active contact with and attention from both parents.
> c. Whether the parents can communicate with each other regarding the child's needs.
> d. Whether both parents have actively cared for the child before and since the separation.

*Hansen* also provides four non-exclusive factors to consider when making physical-care determinations:

> Factors often of importance in determining the viability of joint physical care include an overriding interest in stability and continuity, the degree of communication and mutual respect, the degree of discord and conflict prior to dissolution, and the extent to which the parties agree on matters involving routine care. While we believe that in many contested cases, the best interests of the child will not be advanced by joint physical care, the courts must examine each case based on the unique facts and circumstances presented to arrive at the best decision.

*Hansen*, 733 N.W.2d at 700. We consider these factors in turn.

As for the first consideration, "[s]tability and continuity factors tend to favor a spouse who, prior to [separation], was primarily responsible for physical care." *Id.* at 696. By all accounts, Niki has been primarily responsible for physical care of the child. Even Adam does not dispute this point. *Hansen* teaches that "joint physical care is most likely to be in the best interest of the child where both parents have historically contributed to physical care in roughly the same proportion." *Id.* at 698. The district court noted physical care of the child has not been equal, "[i]f each parent's caretaking were placed on a scale, Niki's side would surely outweigh the other" but thought "it is balanced enough that the child would flourish under either parent's care." And Adam wants to be in the child's life as much as possible.

---

e. Whether each parent can support the other parent's relationship with the child.

. . . .

g. Whether one or both parents agree or are opposed to joint custody.

h. The geographic proximity of the parents.

i. Whether the safety of the child, other children, or the other parent will be jeopardized by the awarding of joint custody or by unsupervised or unrestricted visitation.

Adam's mother, with whom Adam resides, testified she observed his parenting every weekend he has the child. She painted a picture of an attentive, caring father.

> Q. Who provides the care for [the child] at your house? Is it Adam, is it you, is it a combination? A. I would say the majority is Adam. He gets up, he gets her breakfast, gets her clothes changed. You know, he does take care of her daily needs. I might help if Adam needs to be in the shower, you know, something like that, where we don't want her wandering the house by herself, and so I do that while he's showering. But the rest of it, he's taking care of her, from the very first day she came to our house.

But Adam's mother also noted his struggles with balancing work and childcare duties before he moved in with her.

> Q. Okay. How did you feel—or what did you observe? What did you think about how Adam was adjusting to his role as a new dad? A. I felt like he was doing okay with it, probably a little tired, a little stressed from lack of sleep, trying to work his 10- or 12-hour shifts sometimes. But the problem was 10-hour shifts and then a waking baby.

We agree with the *Hansen* proposition that "where one spouse has been the primary caregiver, the likelihood that joint physical care may be disruptive on the emotional development of the [child] increases." 733 N.W.2d at 698. To be fair, Adam loves his child. But the role of caretaker requires more. Throughout the trial, witnesses contrasted Niki's past involvement with Adam's. We rely on the principle that, "in family law matters, past performance is a strong indicator of what is yet to come." *Hensch v. Mysak*, 902 N.W.2d 822, 825 (Iowa Ct. App. 2017). Since the child's birth, Niki handled the day-to-day routine, including preparing meals, staying with the child when sick, scheduling and attending the child's doctor appointments, reading books and planning activities with the child, arranging playdates, bathing the child, and putting her to bed. Witnesses observed Adam being less involved. Before the parties separated, the daycare provider, who was

in the home several times each week, testified that Adam was often on the couch with his phone, not engaging with the child. While he did pick up the child from daycare routinely, there were no other parental functions identified. Adam mentioned attending doctor appointments, but the record reflected he attended only one doctor appointment and was unable to name the child's pediatrician. When the child was scheduled for a MRI scan, Adam did not believe it was necessary and said he was unable to go because of his work.[11] And Adam's ability to provide physical care without support from others is unproven. Adam, a thirty-three year old man, has lived with his parents since June 2019, and at times he relied upon his mother to wake him for work and manage his finances.[12]

Finally, we note Niki's flexible work schedule allows for more continuity in care. Adam leaves for work at 5:20 a.m. at least four days each week, returning home after a twelve-hour shift. In contrast, Niki can be anywhere at any time to handle the care of the child. There was no evidence presented at trial to address who would care for the child around Adam's work schedule. Overall, the proven continuity and stability offered by Niki provides the best environment for the child's continued development and growth. "[T]he factors of continuity, stability, and approximation are entitled to considerable weight." *Hansen*, 733 N.W.2d at 700. So this factor weighs heavily in Niki's favor.

Under the next factor, we consider "the ability of spouses to communicate and show mutual respect." *Id.* at 698. Both parents testified communication was

---

[11] The child had been stumbling so a scan was ordered.
[12] This behavior occurred during the time Adam lived with Niki. Niki asked Adam's mother to quit enabling Adam by handling his finances.

a major issue in their relationship that progressively worsened leading up to the separation. They disagree on whether their ability to communicate and effectively co-parent can improve going forward. Adam acknowledges past and present communication issues, but he is optimistic that things have improved and will continue to do so. Niki remains highly skeptical based on history with Adam.

Turning to events post-separation, Niki noted continuing issues communicating with or even reaching Adam. She testified they had no communication for "two or three months" until two weeks before the trial date. Adam's mother explained that Adam had no cell phone in April, May, and June 2020 because he could not afford one even though Adam is living with his parents and making almost ninety thousand dollars annually. Niki alleged Adam ignored "probably twenty" of her text messages about the child since the separation. Again, Adam blamed the lack of communication on his inability to afford a phone. At trial, Adam confirmed he is open to "whatever means it might take . . . to effectively communicate with [Niki]." But his past conduct does not support this claim. Adam stated to Niki in 2017 that "he needed to get his shit together and grow up" now that he had a child. Yet during the relationship Adam would leave, disengage from the family, and avoid Niki when frustrated. Not prioritizing the need for a cell phone to allow for communication with the mother of your child when your goal is to split parenting duties evenly mitigates against Adam's promise to do whatever it might take to effectively communicate with Niki.

In our analysis of the first and second *Hansen* factors, we find joint physical care is not in the best interest of the child. And under the third factor, the degree

of conflict between the parents, we observe that conflict now is low given the lack of communication between the parties. *Id.* at 700. The *Hansen* court noted:

> Joint physical care requires substantial and regular interaction between divorced parents on a myriad of issues. Where the parties' marriage is stormy and has a history of charge and countercharge, the likelihood that joint physical care will provide a workable arrangement diminishes. It is, of course, possible that spouses may be able to put aside their past, strong differences in the interest of the children. Reality suggests, however, that this may not be the case.

*Id.* at 698. Yet, we note the degree of conflict was previously high, and included aggressive behaviors by Adam due to "anger issues."[13] While there is no indication in the record that the parents are still fighting at that intensity, they speak infrequently. Thus, we have no assurance the parties have effectively addressed conflicts that might impede a shared-care schedule.

Finally, we address "the degree to which the parents are in general agreement about their approach to daily matters" in raising the child. *Id.* at 699. The *Hansen* court noted:

> It would be unrealistic, of course, to suggest that parents must agree on all issues all of the time, but in order for joint physical care to work, the parents must generally be operating from the same page on a wide variety of routine matters. The greater the amount of agreement between the parents on child rearing issues, the lower the likelihood that ongoing bitterness will create a situation in which children are at risk of becoming pawns in continued post-dissolution marital strife.

*Id.* at 699. This factor is difficult to gauge given Adam's limited involvement in the day-to-day care of the child. We have full confidence the parties can communicate within the parameters of joint legal custody, but given our analysis above, we are

---

[13] In a text-message exchange, Adam's mother acknowledged to Niki that Adam had mood swings and anger issues.

not convinced a joint physical care plan promotes the child's long-term physical and emotional health.

**B. Separation of the Siblings.**

In considering the best physical-care arrangement for the child, we also factor in the closeness of the sibling relationship here. Niki points to the child's relationship with her older half-sister as cutting against an award of joint physical care. She argues

> [the child's] relationship with her sister is so close that the loss of part of that relationship would be very traumatic for [the child]. The court should grant Niki [physical] care with Adam receiving reasonable visitation to keep this very close sister relationship intact, as best as it can be.

We recognize "the presumption that siblings, including half-siblings, should not be separated." *Armstrong v. Curtis*, No. 20-0632, 2021 WL 210965, at *7 (Iowa Ct. App. Jan. 21, 2021). That said, "[t]he rule is not ironclad . . . and circumstances may arise which demonstrate that separation may better promote the long-range interests of the child." *In re Marriage of Jones*, 309 N.W.2d 457, 461 (Iowa 1981).

The age difference between the two half-sisters is over ten years. Yet there was evidence the two are very close,[14] and testimony revealed Niki's older daughter is involved in the child's life and helps provide care. Even more, some of the care by the older sister occurred at the direction of Adam during times when it was his responsibility to provide care for the child. Several witnesses supported the evidence of the close relationship, and no one rebutted it. In some cases, the

---

[14] At trial, it was described that the child wakes her older sister every morning, and pre-pandemic, waited at the door to see her older sister come home from school. Likewise, the older sister attended to the needs of the child when Niki was doing other things in the home.

age difference between siblings mitigates the harm of separation in the custodial decision. *See, e.g.*, *In re Marriage of Brauer*, 511 N.W.2d 645, 647 (Iowa Ct. App. 1993) (noting the thirteen-year age difference between the half-siblings prevented them from being play companions and likely meant they would not reside together for more than four or five years so that relationship would not trump awarding custody to the primary caregiver). But, we still examine the best long-term interest of the child and our strong interest in keeping children of broken homes together. *In re Marriage of Orte*, 389 N.W.2d 373, 374 (Iowa 1986).

Here, the half-sister has been a constant in the child's short life. We do not take the potential adverse effects of separating the siblings lightly, but we also lack the benefit of the district court's analysis of the relationship because the ruling is silent on the subject. We cannot say, on this record, that the separation of the siblings under a joint physical care arrangement will "better promote the long-range interests of the [child]." *See In re Marriage of Kurth*, 438 N.W.2d 852, 854 (Iowa Ct. App. 1989). The status quo over the past three years includes daily contact between the children, and given our analysis supporting physical care to Niki, we find the best interest of the child requires strong consideration of this special relationship. With that in mind, the factors supporting a joint physical care arrangement are not so strong as to require separating the half-siblings.

Given the sibling relationship and because the factors do not support the parenting schedule ordered by the district court, we conclude the best interest of the child will be advanced by giving physical care to Niki rather than awarding joint physical care. To promote Adam's role in the child's life, we order liberal visitation. Adam shall have visitation every other weekend from Friday at 5:00 p.m. until

Sunday at 6:00 p.m. Because Adam does not work on Fridays, he shall have visitation every Thursday overnight, starting at 5:00 p.m. and continuing until Friday at 5:00 p.m. on weeks he does not have weekend visitation. The spring break, holiday, and summer schedule developed by the district court shall remain in effect.

We remand to the district court to determine the proper level of child support given the change in physical care and visitation, effective the date procedendo is issued. On remand, the district court should recalculate the obligation "based on the present financial circumstances of the parties and the child support guidelines." *See In re Marriage of Hoffman*, 867 N.W.2d 26, 37 (Iowa 2015).

## C. Reliance on Testimony of D.B.

Although we reverse the joint physical care decision, we address Niki's concerns about a witness at trial. Niki claims the district court erred in relying on the testimony of D.B., arguing D.B. changed her tune in comparison to an affidavit she wrote for the temporary custody hearing in September 2019. Niki postures D.B. testified differently because their friendship soured. But, the district court relied heavily on D.B's testimony in making its decision, stating "[h]er testimony was not biased, and comparable to what you would see from a guardian ad litem for a child. She was a voice for the child. She was credible." Although we are not bound by the district court's fact findings we give them weight, especially concerning witness credibility. *Thorpe*, 949 N.W.2d at 5. Even with this credibility finding, we are unconvinced the joint physical care arrangement is appropriate here. First, D.B. confirmed her opinion that Niki was the primary caretaker of the child:

19

Q. In your opinion, who was the primary caregiver while Adam and Niki were in a relationship?  A. Niki was the primary caregiver. Her job allowed her to be at home more with the kids, so she did a lot of those things.

Q. Do you think that Adam also provided care for the children? A. Yes, he did.  But he also worked 12-hour shifts, so he wasn't there as much.  By the time he'd get home, you know, it's supper, and then the nightly routine, you know.

D.B. did observe Adam's visits with the child, and she testified Adam was prepared and engaged; he brought snacks and toys for the child and generally exhibited good parenting skills.  Still, D.B. only observed three visits.  We agree with D.B. that both Niki and Adam are good parents.  But we also note the stark difference between D.B.'s trial testimony and the opinions she expressed in her affidavit[15] for the

---

[15] In her affidavit, D.B. stated:

Since Adam has left their home in June, 2019, I have spent a lot of time with Niki . . . and [the child].  I have observed a mother living in fear for the safety of herself and her children.  I was present when Niki received a threatening message from a friend of Adam's.

. . . .

To date, I have supervised three visits between Adam Haugen and [the child].  On all occasions, I took [the child] out of her car seat and stood her on the ground so she was able to see Adam in the driveway.  I expected [her] to say "daddy" and run to Adam with her big smile, but that wasn't the case.  [The child] didn't move and seemed very hesitant.  Adam had to come to her and pick her up. [ The child] didn't cry, but was very quiet, which isn't typical behavior for her.

During the first two visits, Adam cares for [the child].  He brought her food and drink, although she wouldn't sit and eat dinner on either occasion.  [The child] interacted with Adam, but also wasn't her normal rambunctious self of an almost 2 year old.

. . . .

To further ensure [the child] was comfortable at my house, Niki brought her over the day after her first visit with Adam.  [The child] was very hesitant upon arrival and held tight to her big sister . . . .  It took [her] several minutes to begin playing like she normally would at my home.

The day after the second visit between [the child] and Adam, I visited Niki and [the child] at their home.  I observed [the child] . . .

temporary custody hearing, before her relationship with Niki soured.  In that same vein, D.B. sent text messages to Niki in September 2019, in which she said she did not think Adam should be alone with the child.  D.B. confirmed saying that, but she clarified that much of the information she was receiving about Adam's drinking habits, mental-health issues, and abusive behavior was one-sided coming from Niki.  So while D.B. offered helpful perceptions about the family, we also weigh the inconsistencies in her testimony in our de novo review.

## D.  Attorney Fees.

Both Niki and Adam request an award of appellate attorney fees.  Under Iowa Code section 600B.26(2020), "In a proceeding to determine custody or visitation, or to modify a paternity, custody, or visitation order . . . the court may award the prevailing party reasonable attorney fees."  Requests for appellate attorney fees are within the discretion of this court.  *Markey*, 705 N.W.2d at 26.  In deciding whether to award appellate attorney fees "we consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the trial court's decision on appeal." *In re Marriage of Ask*, 551 N.W.2d 643, 646 (Iowa 1996).  Because Niki, the prevailing party, has sufficient income from which to pay attorney fees, we decline to award her appellate attorney fees.

---

crying every time Niki walked out of her sight.  This behavior is not typical for [her] when I am there.

**IV. Conclusion.**

We modify the district court's award of joint physical care of the child and remand for additional proceedings to determine the appropriate child-support obligation. We decline to award either party appellate attorney fees.

**AFFIRMED AS MODIFIED AND REMANDED.**